Cite as 2026 Ark. App. 53

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CR-25-69

| | | |
|---|---|---|
| DORALEE KEETON | | Opinion Delivered January 28, 2026 |
| | APPELLANT | |
| | | APPEAL FROM THE DALLAS COUNTY CIRCUIT COURT |
| V. | | [NO. 20CR-23-123] |
| | | |
| STATE OF ARKANSAS | | HONORABLE JIM F. ANDREWS, JR., |
| | APPELLEE | JUDGE |
| | | |
| | | REVERSED AND DISMISSED |

**CINDY GRACE THYER, Judge**

Appellant Doralee Keeton was found guilty by a Dallas County jury of one count of obstructing governmental operations, a Class C misdemeanor, and sentenced to pay a $500 fine.[1] On appeal, Keeton argues that the evidence was insufficient to support her conviction; in addition, she argues that the circuit court should have held a hearing on her posttrial motion for new trial. We agree with Keeton's first point on appeal, and we reverse and dismiss.

The events that led to the State's prosecution of Keeton began on July 15, 2023, when a police dispatch alerted officers that an individual in a home on Parkwood Lane in Fordyce

---

[1]Keeton was originally charged with hindering apprehension or prosecution, *see* Ark. Code Ann. § 5-54-105 (Supp. 2025). The obstruction charge was added via an amended information about a week before Keeton's trial commenced.

was attempting suicide. Sergeant Jordan Ables with the Dallas County Sheriff's Office responded to the scene. From "past experiences," Ables knew that Jackson Parham and Madeline Keeton lived at that address. Ables, who was the second officer on the scene, found Madeline in "an extremely distraught state" with a scratch across her neck. An ambulance arrived and transported Madeline to the Dallas County Medical Center; Ables followed the ambulance to the hospital. Once he got there, a nurse advised him there was "something in [Madeline's] purse that should not be in the hospital room." When Ables entered Madeline's hospital room, he immediately smelled marijuana. A subsequent search of her purse revealed a crystal-like substance consistent with methamphetamine.[2] Ables opted not to arrest Madeline at the time, feeling that she "obviously needed help" that the jail could not provide her.

On October 8, 2023, officers conducted a parole visit at Jackson Parham's home on Parkwood Lane and discovered methamphetamine. Jackson told the officers that the drugs belonged to Madeline and that he had just taken her to the hospital. On October 10, Madeline's mother, Doralee Keeton, sent an email to Ables and others (including two deputy prosecutors, a public defender, Jackson's mother, and Jackson's probation officer) appearing to confirm that the drugs discovered during the parole search belonged to Madeline. As a result, on November 14, Ables obtained an arrest warrant for Madeline for the July 15 incident.

---

[2]Testing at the state crime lab confirmed the substance was 6.8 grams of methamphetamine.

After the arrest warrant was secured, Deputies Woffard and Walton were assigned to serve it. They first looked for Madeline at the Dallas County courthouse, where she worked, but did not find her there. Ables then instructed them to look for Madeline at the Parkwood Lane address. Shortly thereafter, Woffard and Walton called Ables to say that Madeline's car was there and lights were on in the house, but no one would come to the door.

Knowing that Jackson was being held in the Dallas County jail, Ables went to the inmate communications system that monitored and recorded all phone calls to and from the jail, thinking that maybe Jackson and Madeline had spoken and that he could possibly determine where Madeline was. He discovered that Jackson had made a phone call to a number that Ables determined belonged to Keeton. A recording of that phone call was played during trial. During the call, Jackson told Keeton he had just gotten a message from Madeline, and Keeton responded that the police were "there to arrest her." She said that police were "banging on her door and she's sending me Ring pictures of them. . . . Dusty Walton and Tim Woffard are at her house. I just told her don't answer the door. They don't have a no-knock. You're not there, so . . . ."[3] She later added, "I don't really have any other choice. I don't tend to break the law."

After Ables listened to the phone call, he spoke with his deputies, who said they had not been able to get Madeline to answer the door, even though her vehicle was there. Ables then secured a search warrant for the Parkwood Lane address and went to the house to

---

[3]Jackson was on parole at the time and had a search waiver on file.

execute it. Once there, the officers informed Madeline that they had a search warrant, and she presented herself to them. At trial, Ables acknowledged that the sheriff's office had not initially sought a search warrant because they "felt that [Madeline] could readily, easily be arrested." He opined that the reason his officers were unable to effectuate an arrest of Madeline when they first went to the house was because of Keeton's phone call advising her daughter not to answer the door.

On cross-examination, Ables acknowledged that Keeton had not been in the house, did not personally prevent his deputies from gaining access to the house, and did not lie to them about Madeline's whereabouts. He further conceded that Keeton had done nothing to help Madeline flee. Regarding the email that Keeton had sent to him and others stating that the methamphetamine at Jackson's house belonged to Madeline, Ables agreed that it was "out of the ordinary" and "[did not] really benefit [Madeline]." With respect to the portion of Jackson and Keeton's conversation where Keeton mentioned the police not having a "no-knock," Ables said that if Jackson had been home, the officers would not have needed a warrant because of his parole status. He admitted he had no evidence that Keeton had any communication with any law enforcement officer, lied to any law enforcement officer, or even saw Madeline on the day of her arrest. Ables added that it took probably twenty to thirty minutes to obtain the search warrant, and once he had it, it took "probably less than five minutes" to get to the house.

Ables conceded that without a search warrant, the officers could not simply enter the house. On this subject, the following exchange occurred:

4

Q: The thing that [Keeton] did wrong is advise [Madeline], "You don't have to open the door if they don't have a warrant."

A: That's correct.

Q: Okay, now, but it turns out you did need a warrant for her to open the door, right?

A: Yes.

Q: And you applied for a warrant, right?

A: That is correct.

Q: And you got the warrant.

A: That is correct.

. . . .

Q: [T]he bottom line is, you needed to get in the house to find a young lady, right?

A: That is correct.

Q: All right. And so--and the judge signed that warrant, didn't he?

A: That is correct.

Q: So that means he agreed with you, right?

A: That is correct.

Q: So since the judge signed the warrant giving you permission to search the house, isn't that proof that you did need a warrant to search that house?

A: I'm not following you.

Q: Let me break [it] down. . . . You admitted twice now that you needed a warrant to search [Madeline's] house, right.

A: Yes.

5

Q:     So what Dori Keeton told [Madeline] was accurate, wasn't it?

A:     To not answer the door?

Q:     You don't have to open the door if they don't have a warrant.

A:     Yes.

Ables confirmed on recross-examination that if Jackson, a parolee with a search waiver on file, was not at home, police officers could not enter the house to arrest Madeline without obtaining a search warrant.

Dallas County Sheriff's Deputy Tim Woffard testified that he and Deputy Walton were tasked with serving the arrest warrant at the Parkwood Drive residence. When they arrived, they saw two vehicles in the carport, which they believed belonged to Madeline and Jackson. He knew, however, that Jackson was being held at the jail and was not at home at the time. He and Walton knocked on all the doors for maybe ten minutes, but no one came to the door. They then left the house and called back to the office to let the office know she did not answer. They were instructed to wait while a search warrant was obtained. After Ables arrived with the search warrant, they knocked on the door again. Madeline finally responded and came out of the house.

On cross-examination, Woffard said the two cars that had been in the driveway when they first arrived were still there when they came back with the search warrant. He agreed that he had no interaction with Keeton that afternoon—he did not see her there, did not see any evidence that she had provided anything to Madeline to help her flee the house, did not

6

interact with her in any way, and had no firsthand knowledge of anything that she did to interfere with the officers' efforts that day.

The State then rested, and Keeton moved for directed verdict on both the hindering-apprehension charge and the obstruction charge. She argued that the State failed to prove that she knowingly made any effort to interfere with the deputies. Keeton asserted that all the State proved was "that she called her daughter and utilized her rights under the First Amendment of the United States Constitution to make a communication to her daughter. And in that communication to her daughter, she says that if they don't have a no-knock warrant, you don't have to open the door. . . . So the only potential crime [she] could have committed is giving her daughter legal advice . . . that turns out to actually be accurate." She added that the obstruction charge required that she "knowingly" made the effort, and "a phone call just ain't it." The State responded that it had presented "sufficient proof based on her own confession and statement and the subsequent actions that were required by law enforcement to establish that she knowingly obstructed, impaired, or hindered the performance of a governmental function." The court found that there were factual questions for the jury and therefore denied the motion.

The jury subsequently acquitted Keeton of hindering apprehension but convicted her of obstruction of governmental operations. She was sentenced to pay a $500 fine. The sentencing order was entered on September 30, 2024. On October 7, Keeton moved for directed verdict or, in the alternative, for a new trial, arguing that a conviction for obstructing governmental operations for giving accurate advice was a violation of her First Amendment

7

rights. She also argued that the State failed to meet its burden of proving that she "knowingly obstructed, impaired, or hindered the performance of any governmental function" under section 5-54-102 (Repl. 2016).

The circuit court did not rule on the motion within thirty days, and Keeton thereafter timely filed her notice of appeal on November 6, 2024. On appeal, she argues that the circuit court should have granted her motion for directed verdict; in addition, she contends that the circuit court erred in not holding a hearing on her motion for new trial.

When reviewing the denial of a directed-verdict motion, the appellate court will look at the evidence in the light most favorable to the State, considering only the evidence that supports the judgment or verdict, and will affirm if there is substantial evidence to support the verdict. *Miller v. State*, 2022 Ark. App. 351, 652 S.W.3d 198. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.* Evidence is sufficient to support a verdict if it is forceful enough to compel a conclusion one way or the other. *Id.*

In her first point on appeal, Keeton argues that the evidence was insufficient to support her conviction for two reasons: (1) her conduct as demonstrated at trial amounted to protected speech, and (2) there was insufficient evidence to prove the elements of the crime beyond a reasonable doubt. Because we find merit in her second subpoint, we do not address her constitutional arguments.

A person commits the offense of obstructing governmental operations if the person knowingly obstructs, impairs, or hinders the performance of any governmental function.

8

Ark. Code Ann. § 5-54-102(a)(1) (Repl. 2016). "Governmental function" means any activity that a public servant is legally authorized to undertake on behalf of any governmental unit he or she serves. Ark. Code Ann. § 5-54-101(6) (Supp. 2021).

Arkansas case law appears to require actual interference with law enforcement officers or government activities in order to sustain a conviction for obstruction of governmental operations. For example, in *Kelley v. State*, this court affirmed an obstruction conviction when the defendant caused a physical disruption to officers who were attempting to administer a field-sobriety test to another individual by shouting, physically approaching the officers, and fleeing back into his home. The officers testified that Kelley's actions hindered their ability to administer the field-sobriety test and interfered with the officers' ability to provide backup for each other. This court held that Kelley's actions "obstructed, impaired, and hindered the officers' ability to perform their governmental functions as law enforcement officers during the investigation of a DWI traffic stop." *Kelley*, 75 Ark. App. 144, 147, 55 S.W.3d 309, 312 (2001).

In *RB v. State*, 2013 Ark. App. 377, the appellant, a juvenile, was convicted of obstructing governmental operations after he repeatedly refused orders from a law enforcement officer to return to his room in a detention facility. The officer testified that RB resisted her orders for at least two hours and that she eventually had to call for back-up officers from the adult detention facility to assist her. This court held that RB's refusal "obstructed [the officer's] ability to secure the [juvenile detention] facility for the evening and impaired the orderly function of the detention center." 2013 Ark. App. 377, at 4–5.

The State relies on *Gordin v. State*, 2021 Ark. App. 96, as holding that the defendant's attempt to alert her brother that officers were outside his residence to serve a warrant constituted substantial evidence to support a conviction for obstructing governmental operations. The defendant in *Gordin*, however, actively engaged with the law enforcement officers, blocking her brother's driveway and honking her car horn repeatedly to alert her brother that officers were approaching and give him time to escape. This supports the conclusion that actual interference with law enforcement or governmental operations on the part of the defendant is required under our obstruction statute.

Here, by way of contrast, by the officers' own testimony, there was absolutely no contact between them and Keeton. The governmental function that the State alleged was obstructed was the service of the arrest warrant on Madeline. Keeton did not take any action to obstruct, impair, or hinder the officers from approaching the house and attempting to make contact with Madeline in order to serve that warrant. Indeed, Wofford, one of the officers who attempted to execute the arrest warrant, expressly testified that he had no interaction with Keeton and had no firsthand knowledge of anything that she did to interfere with his efforts that day.

Keeton spoke to *Madeline*—not the officers--and told *her* that she did not have to open the door if the officers did not have a search warrant. Merely correctly advising her daughter of her constitutional rights did not constitute the knowing obstruction, impairment, or hindrance of a governmental function required by section 5-54-102. Providing such advice is not physically interfering with police activities, *see Kelley*, *supra*, or

10

preventing officers from performing lawful duties. *See RB, supra*. In short, Keeton did nothing to personally interfere with the officers' activities. Under our case law, we therefore agree with Keeton that the evidence was insufficient to sustain a conviction for obstruction of governmental operations.

Because we reverse on Keeton's first argument, it is unnecessary to reach Keeton's First Amendment argument regarding the sufficiency of the evidence, and her second point on appeal--that the court should have granted a hearing on her motion for new trial--is moot.

Reversed and dismissed.

HARRISON and TUCKER, JJ., agree.

*The Firm, PLLC*, by: *S.L. Smith*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Michael Zangari*, Ass't Att'y Gen., for appellee.